# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DIONTE HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 7397** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **MICHAEL J. ASTRUE,** | ) | **Maria Valdez** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Dionte Harris's claim for Disability Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Harris's motion for summary judgment [Doc. No. 23] is granted. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

**BACKGROUND**

## I. PROCEDURAL HISTORY

Plaintiff Dionte Harris ("Plaintiff," "Claimant," or "Harris") filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on June 26, 2007. (R. 23.) In both applications, he alleged disability beginning November 8, 2006. (*Id.*) Plaintiff's claims were denied initially on September 27, 2007, and upon reconsideration on November 13, 2007. (*Id.*) Plaintiff timely filed a written request for a hearing by an Administrative Law Judge ("ALJ") on January 3, 2008. (*Id.*) Plaintiff appeared and testified at a hearing held on January 14, 2010. (*Id.*) Also appearing and testifying were impartial medical expert Dr. William Newman ("Dr. Newman"), and impartial vocational expert Dr. Richard Hamersma ("Dr. Hamersma"). (*Id.*)

On March 2, 2010, the ALJ denied Plaintiff's claim and found him "not disabled" under the Social Security Act. (R. 44.) The Social Security Administration Appeals Council denied Plaintiff's request for review on October 21, 2010. (R. 1.) The ALJ's decision thus became reviewable by the District Court under 42 U.S.C. § 405(g), *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), and Plaintiff filed the instant motion on August 2, 2011. [Doc. No. 23.] This matter has been fully briefed since October 26, 2011. [Doc. No. 26.]

## II.  FACTUAL BACKGROUND

### A.  Harris's Reports & Testimony

Mr. Harris was born on May 13, 1977; at the time he claimed that he was unable to work – November 8, 2006 – he was twenty-nine years old. (R. 250.) Harris alleged that he was unable to work due to his physical condition; specifically, he complained of elbow, hand, hip, back, buttock, knee, and wrist pain. (R. 26.) Before he claimed he was unable to work, Harris stacked products on pallets and performed quality control at a factory through a temporary employment agency. (R. 42.)

In his Activities of Daily Living Questionnaire, Plaintiff reported that he lived with his fiancé and two daughters. (R. 288.) He indicated that his fiancé cooked his meals, and that he did very few, if any, of the household chores. (*Id.*) Harris reported that he first started feeling a problem in 1998, and that he had no problems walking before that time. (R. 289-90.) He also indicated that he rarely or never drove because his knees locked up, and that he watched his children often, but that he could not move around quickly. (R. 291.) Harris reported that "standing up for a short period of time in one spot" or "sitting down in one spot too long" made his knees lock up. (R. 285.) He also reported that it was difficult to use stairs, and that he had to pop his knees to relieve pressure and pain when he got up from chairs or out of bed. (R. 286.) Harris indicated that he needed assistance standing and balancing. (*Id.*)

In a separate disability report, Harris explained that "arthritis in both knees w/ contusion" were the illnesses, injuries or conditions that limited his ability to work. (R. 279.) He also reported that he wore braces on both legs, that his legs go out without notice, and that due to the pain he was sleep-deprived to the point that it had begun to affect his ability to concentrate and remember things. (*Id.*) In a subsequent disability report, Harris reported that his condition had gotten worse, that he suffered with constant pain, and that his legs were giving out. (R. 296.) In his most recent disability report, he claimed increased stiffness and pain. (R. 307.) He also complained about stiffness in his left elbow and uncontrollable spasms in his elbow and legs. (*Id.*)

At the hearing, Harris testified that he stopped working in 2006 because his knees kept giving out on the assembly line, and his employer fired him because he was not able to perform his job. (R. 67-68.) He claimed that he could not work at the time of the hearing because of the pain that he had, the trouble he had getting around, problems with his equilibrium and his medication. (R. 78.) He testified that he had a hard time just standing up, walking, stitting and moving. (*Id.*) He stated that he had good days and bad days. (*Id.*) Harris testified that physical therapy provided no benefits. (R. 83.) Harris reported that he can stand only five minutes before he has to change position. (R. 103.) He said that he can walk about a block or two without resting. (R. 104.) After walking any longer than that, Harris testified that he suffered from shortness of breath and that his lower back and knees start to hurt. (*Id.*) Harris also testified that he can sit about twenty to thirty minutes

without changing positions. (*Id.*) Harris also recounted an incident about how his iPod was stolen from him on the street; he said that he chased after the robber. (R. 84.) He explained that his leg gave out, that "it hasn't been right since," and that the incident led him to discover the severity of his back pain. (*Id.*)

Harris testified that he received his primary care at Friend Family Health Center. (R. 139.) Harris said that he was prescribed a variety of medications for his pain, and that he also received injections. (R. 85, 87.) He explained that the injections "didn't really work at all period." (R. 87.) Harris also said that he had to go to the emergency room several times for his pain. (R. 87-88, 140.) Harris testified that he had physical therapy at the University of Chicago Medical Center in 2008. (R. 95.) He also said that he received physical therapy at the Illinois Institute of Rehabilitation and at the Rehabilitation Institute of Chicago. (R. 137-38.) Harris testified that he saw a rheumatologist and an orthopedic specialist at Rush University Medical Center, and that he was referred to and attended the Rush Pain Center for treatment. (R. 138-39.) He also said that he performs a home exercise routine in the morning, but that it does not help. (R. 99.) Harris testified that his physical therapist and his primary care doctor, Dr. Deol, prescribed the use of a cane. (R. 95.) He said that he always uses it. (R. 95-96.) He also testified that he uses a leg brace. (R. 98.)

Harris testified that his fiancé does the cooking, the laundry, buys the groceries, and takes out the trash. (R. 101.) Harris said that he tries to vacuum and wash the dishes, but that those activities cause him too much pain. (*Id.*) He

explained that during the time he is home with his children, he is the one who is responsible for supervising them. (*Id.*) He said that he helps the kids with her homework, and that he watches television and plays video games with them. (R. 100, 103.)

### B. **Medical Evidence & Expert Testimony**

#### 1. *Plaintiff's Treating Physicians & Therapists*

As the ALJ states in her decision, Harris "has been treated extensively, by numerous providers at various facilities." (R. 28.) On November 21, 2006, Plaintiff saw Dr. Ahmad at Provident Hospital of Cook County. (R. 348-70.) Plaintiff complained of a five-year history of bilateral knee pain, which he reported had gotten worse in the preceding two months. (R. 348, 354.) The progress notes indicate that Harris reported that prior courses of medication and physical therapy had not relieved his pain, and that he sought additional treatment. (*Id.*) Dr. Ahmad noted that Plaintiff ambulated with a steady gait. (R. 354.) Dr. Ahmad ordered x-rays and an MRI and prescribed naprosyn, an anti-inflammatory. (R. 359-60.) On December 26, 2006, Dr. Ahmad increased the dose of naprosyn and referred Plaintiff for physical therapy. (R. 361.) Dr. Ahmad also advised Plaintiff to follow up with an orthopedic specialist. (*Id.*) On April 10, 2007, Dr. Ahmad noted that a recent MRI exam ruled out a meniscal tear, but showed a small contusion and some swelling. (R. 362.) Dr. Ahmad noted full range of motion of the right knee. (*Id.*) He advised Plaintiff to continue his home exercise program, and to take regular strength Tylenol as needed. (*Id.*) Dr. Ahmad also ordered a lumbar x-ray. (*Id.*) On

June 26, 2007, Dr. Ahmad injected medication into Plaintiff's left knee. (R. 366.) On July 10, 2007, Plaintiff told Dr. Ahmad that the knee injections only provided a brief period of relief. (R. 370.) Dr. Ahmad told Plaintiff to continue taking naprosyn and referred him to an orthopedic specialist again. (*Id.*)

Plaintiff attended physical therapy sessions at Provident Hospital between January and March of 2007. (R. 363-69.) The progress notes indicate that Plaintiff repeatedly complained that his medications were not helping. (*Id.*) At the time of discharge, the therapist noted some improvement. (R. 367.) Plaintiff's physical therapist reported that Plaintiff demonstrated symptoms consistent with severe osteoarthritis of both knees. (R. 549.) The therapist said that Plaintiff consistently attended therapy sessions and performed his home exercise program, and that the therapy was discontinued because of a lack of progress. (*Id.*)

On October 29, 2007, Plaintiff visited the Fantus Orthopedic Clinic. (R. 388.) Plaintiff complained of bilateral knee pain, and the doctor noted that Plaintiff's left knee was tender to examination. (*Id.*) The doctor ordered x-rays of Plaintiff's knees and hips. (*Id.*) In a follow-up appointment on December 10, 2007, Plaintiff reported that he was still suffering from bilateral knee pain, and that he was using a brace on each knee and taking naproxen. (R. 389.) The doctor diagnosed polyarticular arthritis of unknown origin. (*Id.*)

On June 25, 2008, Plaintiff commenced a course of primary care treatment at the Friend Family Health Center. (R. 405.) Plaintiff complained of arthritis in both knees, and reported an elbow fracture along with hereditary low back pain and hip

pain. (*Id.*) Dr. Gayle Smith found crepitus with light palpation of Plaintiff's left knee, but did not note any other significant anatomical abnormalities. (*Id.*) Dr. Smith ordered x-rays of Plaintiff's wrists, knees, and hips, and an MRI. (R. 405-06.) The knee x-rays revealed a small medial compartment osteophyte representing minimal osteoarthritic disease in the right knee, and a multipartite patella in the left knee. (R. 421.) The hip x-rays revealed small ossicales adjacent to the acetabulum and suggested minimal osteoarthritic disease. (R. 423.) The x-ray of the right wrist revealed a soft tissue abnormality, but normal bones. (R. 420.)

Plaintiff saw Dr. Smith again on July 8, 2008. (R. 401.) Dr. Smith noted that Plaintiff's x-rays showed minimal arthritis. (*Id.*) Dr. Smith re-ordered the MRI. (*Id.*) After the MRI exam, Plaintiff saw Dr. Smith on July 17, 2008. (R. 403.) Dr. Smith diagnosed Plaintiff with chondromalacia of the left patella, and referred him to an orthopedic specialist. (R. 404.) Dr. Smith also advised Plaintiff to pursue physical therapy and prescribed tramadol and nabumetone. (*Id.*) The knee MRI results were interpreted as normal. (R. 416.) Plaintiff saw Dr. Smith again on August 18, 2008, and his primary complaint was left hand pain and episodic "locking up" of the hand. (R. 399.) Dr. Smith recommended physical therapy and occupational therapy. (R. 400.) Plaintiff also saw Dr. Smith on October 8, 2008, November 19, 2008, and December 19, 2008. (R. 439-44.)

On October 2, 2008, Dr. Smith completed an arthritis/pain residual functional capacity questionnaire. (R. 390.) She noted that his likely diagnosis was chondromalacia patella. (*Id.*) She reported that Plaintiff's pain was severe, and that

his knee pain requires the use of a cane. (*Id.*) Dr, Smith also referenced Plaintiff's osteoarthritis and the pain he experienced in his wrists, hands and hips. (*Id.*) Dr. Smith reported that Plaintiff had reduced range of motion, reduced grip strength, sensory changes, tenderness, crepitus, swelling, muscle weakness, and abnormal gait. (*Id.*) She explained that Plaintiff's symptoms would interfere with the attention and concentration needed to perform simple working tasks "ocassionally." (R. 391.) Dr. Smith opined that Plaintiff could walk less than one block without rest or severe pain, that he could sit for one hour before needing to get up, that he could stand for fifteen minutes before needing to sit down, and that Plaintiff could sit and stand/walk around six hours in an eight-hour workday. (*Id.*) She also reported that Plaintiff requires a position that permits shifting positions at will. (*Id.*)

On September 22, 2008, Plaintiff saw Dr. Jeffrey Mjaanes, an orthopedic specialist at Rush University Medical Center. (R. 564.) Dr. Mjaanes found that Plaintiff had full range of motion of both hips and a negative straight leg raising test, but slightly decreased range of motion of both knees and slightly decreased motor power of the left leg. (*Id.*) Dr. Mjannes explained that most of the findings are "consistent with patellafemoral stress syndrome and MRI findings, although not visualized today, seem to indicate chondromalacia patella." (R. 565.) Dr. Mjannes also noted that Plaintiff's pain was completely out of proportion to his physical exam or imaging findings. (*Id.*) On October 16, 2008, Dr. Mjannes reported that Plaintiff continued to have tenderness on his patellar facets and had a positive patellar grind test. (R. 563.) The doctor concluded that Plaintiff suffered from

bilateral knee pain, and explained that "[b]asically I believe this is patellofemoral syndrome gone awry. I think that there is likely a psychosomatic component to his pain as his exam is out of proportion to this physical findings." (*Id.*) Plaintiff had follow-up visits with Dr. Mjannes on November 20, 2008 and on January 12, 2009; Dr. Mjannes noted little change at both visits. (R. 561-62.) On March 2, 2009, Dr. Mjannes reported that Plaintiff did not have a rheumatologic condition. (R. 558.) Dr. Mjannes's impression was that Plaintiff had bilateral patellofemoral syndrome with possible chondromalacia patella on the left knee, left medial epicondylitis, and low back pain, "likely muscular." (*Id.*) Dr. Mjannes explained that Plaintiff's pain "is out of proportion to his exam findings and may not be organic in nature." (R. 558.) At the appointment, Plaintiff received a left knee injection and a left elbow injection. (*Id.*) On April 13, 2009, Dr. Mjannes reported that there were no significant changes in Plaintiff's condition. (R. 557.) Dr. Mjannes also reported that autoimmune conditions had been ruled out, and that there was no surgical indication. (*Id.*) The doctor noted that his pain response was exaggerated, and that a referral had been given to the pain center. (*Id.*)

Beginning in January of 2009, Plaintiff began to see Dr. Kiranjit Deol at Friend Family Health Center. (R. 438) Dr. Deol also diagnosed Plaintiff with patella chondromalacia. (*Id.*) Dr. Deol referred Plaintiff to a pain clinic and a rheumatologist. (R. 437-38.) Dr. Deol prescribed nabumetone, tizanidine, baclofen, colace, tramadol, Tylenol three, and Lyrica. (R. 597.) Dr. Deol also prescribed the

use of a cane in March of 2009, and a new knee brace in July of 2009. (R. 433-34, 604-05.) Plaintiff continued to see Dr. Deol through November of 2009. (R. 595.)

Plaintiff had an initial physical therapy evaluation at the University of Chicago Hospitals on November 26, 2008. (R. 410.) A January 7, 2009 progress note indicates that Plaintiff had attended five sessions of physical therapy at that time, and that Plaintiff had improved on several goals. (*Id.*) The progress note also indicated that Plaintiff was independent in his home exercise program and had some increased strength and range of motion, but continued to complain of pain. (*Id.*) A February 11, 2009 progress note indicates that Plaintiff had attended twelve sessions at that time. (R. 425.) The note also indicated that Plaintiff had met some of the other goals set by the therapist, and that she recommended two more weeks of therapy. (*Id.*)

On January 4, 2009, Plaintiff was seen in the emergency room at the University of Chicago Medical Center. (R. 550.) Plaintiff complained of knee pain, and he was instructed to "[c]ontinue home meds, [r]eturn to ER with any concerns or worsening symptoms," [and] [i]ce and elevate as tolerated." (*Id.*)

On January 16, 2009, Plaintiff saw Dr. Andrew Ruthberg, a rheumatologist at Rush University Medical Center. (R. 514.) Dr. Ruthberg reported that there were no signs of inflammatory disease. (R. 516.) He said that he could "accept the idea that he has some mechanical problems involving the left knee and the lumbar spine, but [that he does] not have a clear explanation for his high level of pain reporting and his marked functional losses." (*Id.*) On January 21, 2009, Dr.

11

Ruthberg noted that Plaintiff's x-rays showed little joint damage, and that there was no evidence of lupus. (R. 525.) Dr. Ruthberg recommended treatment at the Rush Physical Medicine and Rehabilitation Clinic. (R. 526.)

On January 19, 2009, Plaintiff saw Dr. Nikhil Verma, a knee specialist at Rush University Medical Center. (R. 566.) Dr. Verma noted that Plaintiff walked with a very slow antalgic gait. (*Id.*) The doctor also reported that Plaintiff's knee MRIs showed effusions of both knees, and that Plaintiff's left knee MRI revealed a bipartite patella. (*Id.*) She suggested that Plaintiff follow-up with a rheumatologist. (*Id.*)

Plaintiff saw Dr. Cecil Desilva and Dr. Bryan Williams for an initial evaluation at the Rush Hospital Pain Clinic on May 11, 2009. (R. 623.) Dr. Desilva noted that Plaintiff could bear weight fully without the cane, but also noted that he had an everted shuffling gait when ambulating with the cane. (R. 624.) Dr. Desilva reported that Plaintiff's MRI of the left knee showed an abnormal signal in the left patellar retinaculum, and a small joint infusion; the doctor reported that Plaintiff's MRI of the right knee showed a moderate joint effusion. (*Id.*) The doctor also noted that there were findings suggestive of patellar chondromalacia. (*Id.*) Dr. Desilva prescribed Ultram, Relafen, and an EMG exam. (R. 625.) On June 8, 2009, the examining doctor, Dr. Demetrious Louis, reviewed the EMG test results and noted that they were normal. (R. 531.) The doctor ordered a lumbar MRI to rule out a sacroilliac injury, and adjusted Plaintiff's prescribed medications. (R. 532.) Dr. Louis also prescribed tizanidine and Lyrica. The lumbar MRI revealed a disc bulge

12

at LS-S1. (R. 466.) On June 15, 2009, the doctor adjusted Plaintiff's medications again, and recommended an injection. (R. 533.) Plaintiff received a lumbar injection on June 25, 2009. (R. 534.) On July 13, 2009, the doctor scheduled a second piriformas injection. (R. 502.) The doctor also noted that Plaintiff had a disc herniation at L5-S1. (*Id.*) On August 10, 2009, Plaintiff's medications were adjusted again. (R. 537.) On September 18, 2009, Dr. Williams scheduled Plaintiff for an initial right lumbar trigger point epidural steroid injection, which was administered on September 19, 2009. (R. 538.) Plaintiff returned for a second injection on October 9, 2009, and a third injection on October 30, 2009. (R. 539, 607.) On November 9, 2009, Dr. Williams wrote a letter for Plaintiff, summarizing his history of treatment at the Rush University Pain Clinic. (R. 676.) Dr. Williams reported that the objective findings were relatively mild, but that Plaintiff did undergo a series of transforaminal epidural steroid injections, as well as injections into the piriformis muscle. (*Id.*) Dr. Williams noted that Plaintiff is not eligible for additional injections, "as he has received the maximum safe allowable number of steroid injections." (*Id.*) With regard to his work status and his ability to tolerate working, Dr. Williams stated that "it is likely that the patient will need work restrictions of light or medium duty characterized by reduced repetitive motion of the lower back, [reduced] time spent standing for prolonged periods so as to reduce strain to his knees, [and a] pound lifting restriction to minimize strain to his lower back." (*Id.*) The doctor recommended a formal functional capacity evaluation. (R. 677.)

On May 21, 2009, Plaintiff returned to the emergency room at the University of Chicago Medical Center. (R. 483.) Plaintiff complained of hip and buttock pain, and reported that he had chased someone for one and a half blocks the night before and had experienced intense pain since. (R. 484.) Hydromorphone and prednisone were administered and he was discharged. (R. 483.)

On June 18, 2009, Plaintiff had an initial physical therapy evaluation at the Hyde Park office of the Rehabilitation Institute of Chicago. (R. 649.) Although Dr. Deol's referral contemplated up to twelve weeks of therapy, the therapist indicated that Plaintiff would need only three or four weeks of treatment. (R. 650.) A July 8, 2009 progress note indicates that Plaintiff tolerated physical therapy well, and that he reported that he did get some benefit from a recent injection. (R. 647-48.) Plaintiff also reported new low back pain. (*Id.*) A July 10, 2009 progress note also indicated that Plaintiff was tolerating treatment well. (R. 645-46.) Plaintiff was discharged from physical therapy at the Rehabilitation Institute of Chicago on July 15, 2009. (R. 653.) The Transfer document indicates that Plaintiff was discharged because he had been referred to a pain clinic.[1] (*Id.*)

On July 30, 2009, Plaintiff had an initial physical therapy evaluation at the University of Chicago Hospitals. (R. 667.) Plaintiff reported that he had been diagnosed with a L5-S1 disc herniation. (*Id.*) The therapist found that Plaintiff had

---

[1] Plaintiff testified he transferred from physical therapy at the Rehabilitation Institute of Chicago to physical therapy at the University of Chicago Hospitals because the treatment was not working. (R. 138.)

14

decreased lumbar range of motion, decreased strength in his lower extremities and core musculature, decreased balance, and poor posture. (*Id.*) The therapist also found that Plaintiff had difficulty bending over, that he was unable to sit more than twenty minutes, that he was unable to walk for more than fifteen minutes, that he was unable to stand for more than thirty-five minutes, and that he had difficulty negotiating stairs. (*Id.*) The therapist also noted gait abnormalities. (*Id.*) The therapist recommended physical therapy treatments once or twice per week for four weeks. (*Id.*) The record does not contain further documentation of Plaintiff's physical therapy sessions at the University of Chicago Hospitals.

On September 10, 2009, Plaintiff returned to the emergency room at the University of Chicago Medical Center. (R. 552.) Plaintiff complained of increased back pain and reported a herniation at L5-S1. (R. 655.) Plaintiff was advised to follow up at the pain clinic. (*Id.*) Plaintiff visited the Rush Hospital emergency room the same day, and made the same complaints. (R. 573.) The doctor prescribed Valium and hydrocodone, and gave Plaintiff a pain injection. (R. 587.)

On January 10, 2010, Plaintiff returned to the Rush Hospital emergency room and complained of back pain. (R. 37.) Records of that visit were not submiited.

2. *Non-treating Experts*

On August 22, 2007, Plaintiff had a consultative physical examination. (R. 380.) Dr. Liana Palacci found that the range of motion of the cervical spine and lumbar spine were normal, and that the range of motion of the shoulders, elbows, ankles, hips, wrists and fingers were normal as well. (R. 382.) Dr. Palacci found

15

some mild crepitus bilaterally, but found no evidence of knee joint swelling. (*Id.*) Dr. Palacci noted that Plaintiff had some difficulty squatting, but that he was able to bear weight and that his gait was non-antalgic. (*Id.*) Dr. Palacci diagnosed Plaintiff with bilateral patellofemoral syndrome. (*Id.*)

Two doctors reviewed Plaintiff's record at the request of the State agency. On September 24, 2007, Dr. Ernst Bone concluded that Plaintiff had a history of bilateral patellofemoral syndrome. (R. 387.) He found that Plaintiff had some mild crepitus bilaterally, but that there was no evidence of knee joint swelling, that he was able to bear weight, and that his gait was non-antalgic. (*Id.*) Dr. David Mack completed a physical residual functional capacity assessment for Plaintiff on November 7, 2007. (R. 372.) Dr. Mack determined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. (R. 373.) Dr. Mack also reported that Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch, and crawl. (R. 374.) Dr. Mack noted that Plaintiff did not require a cane or crutch to walk. (R. 379.)

At the hearing, Dr. Newman testified that Plaintiff suffers from several medically determinable impairments. (R. 111-12.) He explained that the imaging studies suggest that Plaintiff has bilateral chondromalacia of the patella, and that he has mild arthritis and degenerative changes in the right knee. (*Id.*) Dr. Newman also testified that Plaintiff has some abnormalities on imaging studies of the left

knee. (R. 113.) He reported that Plaintiff has mild degenerative changes of the lumbar spine, but normal EMG findings. (R. 114.) He noted that Plaintiff might have suffered a muscle sprain or strain of the greater trochanter and/or piriformis muscles, but also noted the lack of objective documentation of a severe or persistent impairment of those muscles. (R. 115.) Dr. Newman opined that Plaintiff has the RFC to perform work at between the light and medium levels. (R. 115-16.) He testified that he did not agree fully with the opinion of the reviewing state agency doctor, and that he did not find significant support in the record for the opinion of Dr. Smith. (R. 116.)

C.    **ALJ Decision**

In her findings, the ALJ stated that Harris met the insured status requirements of the Social Security Act through December 31, 2007, and found that he had not engaged in substantial gainful activity since his alleged onset date. (R. 26.) The ALJ determined that Harris suffered from the following medically determinable severe impairments: mild arthritis of the knees with possible chondromalacia, and mild degenerative changes of the lumbar spine. (*Id*.) The ALJ determined that Plaintiff's condition did not meet or medically equal any Listing. (R. 27.)

The ALJ detemined that Harris had the residual functional capacity

> to perform most unskilled light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). He can lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently and can sit, stand and/or walk throughout a normal workday, with typical breaks. Because of his

complaints of bilateral knee and left arm pain, he should not do constant repetetive pushing or pulling against resistance with the dominant left upper or other lower extremity, and he should never climb ladders, ropes or scaffolds or work on moving or unstable surfaces. He can occasionally clib ramps or stairs, stoop, kneel, crouch or crawl. He should not perform work that would expose him to unprotected heights or unguarded hazardous equipment. He would be distracted only rarely by pain or other symptoms to the extent that he was off task and not productive outside break time. The objective medical evidence does not establish that claimant has significant limitations using his hands for handling or fingering objects within these weight limits, or that he requires a cane to ambulate.

(R. 27-28.)

After summarizing the medical evidence, the ALJ stated that she gave significant weight to the opinion of Dr. Newman. (R. 38.) The ALJ explained that Dr. Newman was an orthopedic specialist and that he had access to all of Plaintiff's medical records, "in contrast with the other doctors who prepared RFC opinions and who had much more limited evidence available." (*Id.*) The ALJ also stated that Plaintiff "did not submit updated detailed RFC opinions from any treating providers, and Dr. Smith offered her opinion after only a few primary visits with claimant." (R. 39.)

The ALJ summarized some of Plaintiff's testimony, and found that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above RFC assessment." (R. 41.) Then the

18

ALJ explained that the relatively mild anatomical abnormalities that Plaintiff had did not explain the severity of the complaints and limitations Plaintiff described. (*Id.*) The ALJ noted that the Plaintiff overstated or exaggerated his condition, symptoms, limitations, medical history and treatment. (*Id.*) The ALJ also noted that Plaintiff did not consistently fill prescriptions, and that Plaintiff made inconsistent reports about his daily activities. (R. 41-42.)

The ALJ determined that Plaintiff was unable to perform any past relevant work, but found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. 43.) Specifically, the ALJ cited the vocational expert's testimony that given Plaintiff's age, education, work experience and RFC, Plaintiff "would be able to perform the requirements of representative occupations such as inspector (5,000 jobs); hand packer (7,000 jobs); or assembler (8,000 jobs)." (*Id.*) Additionally, the ALJ reasoned – again, based upon the vocational expert's testimony – that Plaintiff could also perform sedentary jobs that exist in significant numbers in the regional economy, "including cashier (5,000 jobs); telephone solicitor (4,000 jobs); or assembler (7,000 jobs)." (*Id.*) The ALJ noted the vocational expert's testimony that the number of sedentary positions would be reduced by thirty percent if Plaintiff used a cane for walking distances greater than fifty feet. (*Id.*)

The ALJ concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national

economy" and had therefore not been under a disability from November 8, 2006 through the date of her decision. (R. 44.)

**DISCUSSION**

## I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.*

Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.     JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence

with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.  ANALYSIS

In his motion for summary judgment, Harris alleges a number of errors related to the ALJ's determination, including: (1) the ALJ's credibility determination was flawed; (2) the ALJ made a mistake of fact regarding Plaintiff's need for a cane; and (3) the ALJ improperly weighed the opinion of Plaintiff's treating physician.

### A.  <u>Harris's Credibility</u>

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record.  *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.

2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.'"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88). When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[2] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *2.

After summarizing a significant portion of Plaintiff's testimony, the ALJ determined that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above RFC assessment."

---

[2] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

(R. 41.) Plaintiff argues that the ALJ's statement "turn[ed] the credibility process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating [the claimant's] credibility as an initial matter in order to come to a decision on the merits." (Pl.'s Mot. for Summ. Judgement, p. 13) (quoting *Brindisi* ex rel *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003)). The Commissioner did not respond to this particular argument. In a recent decision, the Seventh Circuit reiterated that such language amounts to "meaningless boilerplate." *Bjornson v. Astrue*, ___ F.3d ___, 2012 WL 280736, at *4 (7th Cir. Jan. 31, 2012) (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). Such language "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that the claimant's complaints were not credible." *Id.* (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). Later in her decision, the ALJ does detail some of the reasons she found Harris to lack credibility – and the Court will address them shortly – but the complementary boilerplate taints her reasoning. The assessment of a claimant's ability to work often depends heavily on the credibility of his statements concerning the intensity, persistence and limiting effects of his symptoms, but the language employed by the ALJ "implies that ability to work [was] determined first and [was] then used to determine the claimant's credibility. That gets things backwards." *Id.* at 4-5.

Even if the ALJ's use of the troubling credibility template was merely an unfortunate way of expressing an otherwise legitimate credibility finding, the

particular reasons she provides for finding Harris's credibility suspect are questionable. Absent the taint of the credibility template, some of the reasons might constitute legitimate grounds for discrediting Harris's claims; however, the (il)logic of the template suggests that the ALJ's approach predisposed her to interpret the evidence in a way that suggested Plaintiff's credibility was lacking at any point that he made a claim at odds with the ALJ's RFC.

For example, the ALJ stated that "claimant has reported steadily increasing symptoms, despite the absence of a significant intervening event or trauma." (R. 41.) However, Harris did experience trauma after chasing the robber who stole his iPod. On May 21, 2009, he visited the University of Chicago Medical Center emergency room complaining of intense hip pain and right buttock pain twelve hours after the incident occurred. (R. 484-85.) Plaintiff testified that he began to experience significant back pain following the incident. (R. 83, 92.) Instead of citing the incident as a potential explanation for Plaintiff's worsening symptoms, the ALJ ignored that possibility – likely because the credibility determination dictated by the ALJ's faulty template would not allow for such an interpretation – and concluded that the fact that Plaintiff chased a thief for a block and a half proved that Harris had a better ability to stand and walk than he described at the hearing, (R. 41.) The ALJ neglected to mention the problems that Plaintiff's brief chase caused, and failed to consider that the fact that Plaintiff suffered injuries by merely exerting himself for a short distance tends to bolster, rather than impugn, his credibility.

Also, the ALJ interpreted Harris's statements to treating examiners that he had a herniated disc as an intentional exaggeration of his diagnosis. There are three problems with the ALJ's conclusion. First, the ALJ ignores that one of Harris's examiners told him, mistakenly or not, that he had a herniated disc. A physical therapy form from Rush Pain Center indicates that Harris was diagnosed with "L5-S1 disc herniation." (R. 502.) Second, the ALJ failed to consider the possibility that Harris simply misstated his condition or mistakenly believed that he had a herniated disc. Considering that there is evidence that he had conditions with labels atypically exchanged in common parlance,[3] it seems much more likely that Harris mistakenly told some treating examiners that he had a related condition with a label increasingly common to laypersons. Third, Harris might not even have been mistaken: he was diagnosed with a disc protrusion or disc bulge at the L5-S1 level, (R. 453, 607, 689), and the difference between a "bulging disc" and a "herniated disc" is debated by some sources. *See Frizzell v. Astrue*, No. CIV S-09-2914 GGH, 2011 WL 476433, at *7 (E.D. Cal. Feb. 4, 2011) (referencing articles that treat a bulging disc and a herniated disc as the same condition and as different conditions). Of course, even if the conditions are distinct, the fact that they are confused or conflated lends credence to the possibility that Harris's representation was not an intentional exaggeration. Again, it seems that the approach dictated by

---

[3] Including, among other conditions, moderate right and mild left neural foraminal stenosis in the cervical spine, (R. 686), mild scoliosis and spondylosis with associated degenerative disc desiccation in the toracic spine, (R. 685), and mild stenosis in the lumbar spine. (R. 689.)

the faulty credibility template disinclined the ALJ from even considering the possibility that Harris was credible.

The ALJ also claimed that Harris "did not always consistently fill prescriptions for analgesic and other prescribed medications, although he generally reported to treating physicians that he had done so." (R. 41.) Plaintiff argues that the ALJ neither referred to specific prescription records to support his conclusion, nor did she refer to medical records showing that Harris had told his doctors that he filled his medications. Plaintiff is only partially correct. In the "Summary of Medical Evidence" section of her decision, the ALJ references a variety of prescription records and occasionally mentions that Plaintiff reported to his doctors that previously prescribed medications provided little benefit, (R. 29-37); however, there is no *analysis* of the records and Plaintiff's statements such that the Court can adequately follow the ALJ's logic. Furthermore, what appear to be instances of the ALJ's *implied analysis* is flawed. For example, the ALJ stated that "Claimant filled a tramadol prescription on September 2, 2009, the first tramadol prescription he had filled since the preceding April." (R. 36.) The ALJ seems to suggest that Plaintiff should have re-filled his prescription earlier, and that Plaintiff was not consistently using the medication. The prescription records suggest that the ALJ is correct about when Plaintiff filled his tramadol prescriptions, but they also indicate that he received 640 tablets of 50mg tramadol in March and April of 2009. (R. 449-451.) The ALJ's decision and the record also indicate that, during the summer of 2009, Plaintiff was directed to take three tablets of tramadol per day. (R. 34, 532.)

With 640 tablets, Plaintiff could have taken 3 tablets a day for more than seven months without a refill. The ALJ's implication that Plaintiff should have refilled his prescription before five months had elapsed is obviously incorrect.

Additionally, the ALJ asserted that Harris "made inconsistent reports about his daily activities." (R. 42.) She pointed out that Harris "reported that he watched [his] children 'often.'" and described himself as a "'stay at home father,' caring for his two young children." (*Id.*) The ALJ claimed that such reports were inconsistent with Harris's testimony that he performed relatively few of the child-care or other household duties. (*Id.*) The Court is unable to follow the ALJ's reasoning. Harris testified that he helped his kids with their homework, watched television and played video games with them, and that he was responsible for them once they got home from school in the afternoon. (R. 100-01.) He also testified that his fiancé did the cooking, cleaning and laundry, took out the garbage, and shopped for groceries. (*Id.*) The Court is unable to discern any inconsistency in Plaintiff's reports and testimony. Once again, it seems as if the ALJ was inclined to reject claims that did not align with the RFC she formed before any credibility determination had been established. As such, this case must be remanded back to the Commissioner for a full and fair analysis of Harris's credibility.

The ALJ also made a mistake of fact that affected her credibility analysis. She discredited Plaintiff because he made several statements about his extensive courses of physical therapy, while "the objective records show that claimant has had very little actual physical therapy." (R. 41.) The ALJ is mistaken: the record reflects

28

that Harris had several courses of physical therapy. (R. 356-57, 410, 425, 549, 645-54, 667-70.) While the record is incomplete in several areas, it was speculative for the ALJ to determine that the absence of some physical therapy records necessarily meant that Plaintiff did not attend particular physical therapy sessions. And, even if Plaintiff did not attend all of his physical therapy appointments, or follow-up on all of the physical therapy for which he was referred – something that he did not ever claim to have done – his assertion that he participated in a significant amount of physical therapy is abundantly clear from the records that were before the ALJ.

Finally, the ALJ discounted the severity of Plaintiff's pain and other symptoms in a manner at odds with Social Security Regulation 96-7p(4). The ALJ explained that "the objective medical evidence shows relatively mild anatomical abnormalities that would not be expected to cause the severe or even extreme complaints and limitations that claimant described at the hearing." (R. 14.) But SSR 96-7p makes clear that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p(4). While the ALJ does not discount Harris's statements about his pain "solely" for that reason, it is clear that her other reasons are problematic as well.

### B.   Harris's Cane

The ALJ determined that "the objective medical evidence does not establish . . . that [Harris] requires a cane to ambulate." (R. 28.) Plaintiff argues that this

finding was erroneous, and argues further that such a mistake of fact requires reversal because the ALJ may have reached a different conclusion at Step 5 had she recognized that Harris required a cane. Determining whether the finding was erroneous is unnecessary here because even if it was, such a mistake is not so significant that the Court cannot reasonably know how the ALJ would have ruled had she found that Harris did require the use of a cane to ambulate.

The VE testified that an individual who required a cane to walk more than fifty feet may be able to perform the sedentary jobs of cashier, telephone solicitor, and assembler. (R. 125.) The VE testified that there were approximately 16,000 such jobs in the Chicago Metropolitan area. (*Id.*) The VE also explained that "some employers don't like the use of a cane because they consider it a hazard," and stated that an individual's need for a cane could reduce the number of sedentary positions by "maybe thirty percent." (R. 126.) In her decision, the ALJ referenced the VE's findings. (R. 43.) The ALJ's explicit consideration of the potential thirty percent reduction in available sedentary positions suggests she found that jobs existed in significant numbers in the national economy that the claimant could perform even if he used a cane. Furthermore, Plaintiff does not argue that the reduced number of jobs in the region (11,200) fails to meet the threshold requirement for the number of positions that are required for a non-disability determination at Step 5. Reversal on this issue is not warranted.

### C.   Harris's Treating Physician

On issues not reserved to the Commissioner, a treating doctor's opinion "receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* (quoting *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011)). "[T]he . . . decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . opinion and the reasons for that weight." SSR 96-2p. An ALJ may reject an examining physician's opinion "only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). Even if there are sound reasons for refusing to give a treating physician's assessment controlling weight, the ALJ is "required to determine what value the assessment did merit." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).

In terms of Dr. Smith, Harris's treating physician, the ALJ summarized some of her treatment notes and "partial RFC opinion," (R. 30, 38), and suggested that her opinion deserved less weight than Dr. Newman's because she "offered her opinion after only a few primary care visits with claimant." (R. 39.) The ALJ

explained that she gave "significant weight to the opinion of Dr. Newman" because he is an orthopedic specialist and had access to all of claimant's medical records, "in contrast with the other doctors . . . who had much more limited evidence available." (R. 38.) The ALJ also noted that Dr. Newman "testified that he did not find significant support in the record for the opinion of Dr. Smith of claimant's marked functional limitations." (R. 38.) However, the ALJ neither evaluated any of the limitations Dr. Smith described in her opinion, nor did she explain her reasons for discounting the doctor's opinion beyond the fact that it was drafted after only four appointments with Harris. While the length of the treatment relationship and frequency of examination are legitimate factors in determining the weight to be accorded a medical opinion, that Dr. Smith examined Harris "only" four times is not a sufficient reason to discount the opinion. *See Eakin v. Astrue*, 432 Fed. Appx. 607, 612 (7th Cir. 2011) (concluding that a claimant's treating physician's opinion was entitled to considerable weight where the doctor had treated the claimant four times over a two-year period). Similarly, the ALJ's allusion to Dr. Newman's disagreement with Dr. Smith is insufficient to discount the opinion absent reasons supported by substantial evidence in the record.[4] The ALJ failed to articulate how

---

[4] That Dr. Newman "had access to all of claimant's medical records" while the other doctors "had much more limited evidence" may be relevant to the weight accorded to the doctors' opinions, but the ALJ should have to explain, with some particularity, how the evidence to which Dr. Newman had access, and to which Dr. Smith and the other doctors did not have access, impacted their particular opinions. Such a generic explanation results in the conclusion that all treating physicians' opinions may be discounted based upon the testimony of a medical expert that has reviewed the record and testifies at a disability hearing.

Dr. Smith's opinion was not well-supported or consistent with the other substantial evidence. There may have been sound reasons supporting the ALJ's decision not to give controlling weight to Dr. Smith's opinion, but the ALJ did not provide them.[5]

Once the ALJ decided not to give Dr. Smith's opinion controlling weight, she was required to consider a variety of factors to determine the weight the opinion was to be accorded. 20 C.F.R. § 404.1527(c)(2). In addition to considering the length of the treatment relationship, the frequency of examination and the specialization of the doctor, the ALJ was required to consider the nature and extent of the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record as a whole. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)(ii)-(c)(5)). The ALJ failed to consider half of the factors outlined in the regulations, and therefore failed to determine properly the weight to be accorded to Dr. Smith's opinion. In fact, the ALJ did not mention what weight, if any, the doctor's opinion was accorded.

The ALJ erroneously discounted the opinion of Plaintiff's treating physician; therefore, the Court concludes that the matter must be remanded to the Commissioner for a thorough consideration of all of the medical evidence in the record and a detailed explanation of why certain evidence was given greater or

---

[5] The Commissioner complains that Plaintiff did not refer to Dr. Smith's treatment notes, and that Defendant's counsel was unable to find any treatment notes from Dr. Smith in the record "despite a careful review." (Def.'s Resp., p. 8, n1.) However, Dr. Smith's treatment notes can be found on pages 397-406 of the administrative record, and Plaintiff cited the treatment notes several times on the tenth page of his memorandum in support of summary judgment.

lesser weight. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)*; Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Commissioner should not assume that any other claimed errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 23] is granted. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.


**SO ORDERED.**                              **ENTERED:**

**DATE: <u>April 25, 2012</u>**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**